In the Matter of the Involuntary Termination of Parent–Child Relationship of S.M., Minor Child, and His Father Jerrell Seth Covington,

Jerrell Covington, Appellant–Respondent,

v.

Marion County Office of Family and Children, Appellee–Petitioner,

and

Child Advocates, Inc., Co–Appellee (Guardian ad Litem).

No. 49A02–0504–JV–345.

Court of Appeals of Indiana.

Jan. 19, 2006.

Michael G. Moore, Indianapolis, for Appellant.

Barry A. Chambers, Indianapolis, for Appellee Marion County Office of Department of Child Services.

## OPINION

VAIDIK, Judge.

### Case Summary

Jerrell Covington appeals the termination of his parental relationship with his biological son, S.M. He argues that the State failed to prove by clear and convincing evidence that (1) there is a reasonable probability that the conditions that led to S.M.'s removal would not be remedied or that (2) the continuation of the parent-child relationship poses a threat to S.M.'s well-being. In response, the Marion County Office of Indiana Department of Child Services alleges that because Covington has taken no action to establish his paternity in this case, he lacks standing to challenge the trial court's determination. Finding no clear error in the trial court's determination that the conditions leading to S.M.'s removal are unlikely to be

remedied, we affirm the termination of Covington's rights. We do find, however, that a putative father has standing to challenge an adverse decision in an involuntary termination proceeding regardless of whether he has taken steps to establish his paternity.

### Facts and Procedural History

Following his birth in August 2003, S.M. tested positive for cocaine. At the time, his father was unknown and, therefore, otherwise unavailable to provide care for him. On August 18, 2003, four-day-old S.M. was removed from his mother's care [1] by what is now the Marion County Office of Indiana Department of Child Services ("DCS").[2] A Child in Need of Services ("CHINS") petition was filed at that time, and at the CHINS hearing, the mother named Jerrell Covington as one possible father of S.M. Tr. p. 25. S.M. was taken into DCS custody and has remained in foster care throughout these proceedings.

The court and DCS were unable to locate Covington, who apparently had moved to Illinois and who has lived there throughout these proceedings. At some point after the August 2003 CHINS hearing—the record is not clear as to how or when—Covington became aware that he may be the biological father of S.M. On January 7, 2004, following notice to Covington by publication, the juvenile court entered a disposition as to Covington— who did not appear at the hearing—ordering that S.M. be removed from his care and remain in his pre-adoptive foster home. Ex. 2. The court further directed DCS to offer no services to Covington until he appeared before the court and DCS to

"demonstrate a desire and ability to care for" S.M. *Id.*

Covington's first and only reported appearance before the court was at an initial hearing for the termination of his parental rights on October 6, 2004. However, the record indicates that Covington did have some phone contact with DCS before this date, Tr. p. 24, and that on April 14, 2004, he called to inform the court that he would be unable to attend a hearing on the matter scheduled for that date due to transportation issues. Ex. 4. Covington also phoned his attorney at the start of a fact-finding hearing on February 24, 2005, to inform the court that he was unable to obtain transportation to the hearing, Tr. p. 12; however, he also failed to attend the rescheduled final hearing on March 9, 2005, though he was represented therein by counsel. *Id.* at 20. Covington has never met or seen S.M., though he did ask his DCS case manager, Michael Holland, to arrange visitation, which Holland told Covington could be accomplished only after Covington took steps to establish his paternity of the child. *Id.* at 40

Nothing in the record indicates that Covington was ever directly ordered by the juvenile court to participate in any particular services in order to demonstrate his desire or ability to parent S.M. At the March 9, 2005, termination hearing, however, Case Manager Holland testified that DCS informed Covington that he would need to establish paternity and complete a parenting assessment and a drug and alcohol assessment if he wished to retain his parental rights to the child and to establish visitation rights. *Id.* at 36–40. Holland testified that Covington told him he did

---

1. The mother's parental rights to S.M. were terminated in separate proceedings.

2. Prior to July 1, 2005, what is now the Marion County Office of DCS was known as the Marion County Office of Family and Children;

therefore, much of the documentation in this case refers to the organization by its former designation or by the abbreviations "MCOFC" or "OFC."

not want to participate in any services, however, until he established his paternity of S.M. *Id.* at 39–40.

Nonetheless, Holland also stated that he had looked into services for Covington in Illinois, specifically seeking to set up a parenting assessment through the Illinois DCS, which could not be arranged because the Illinois DCS reported that it does not offer such a service. *Id.* at 38. Holland informed Covington, then, that he could undergo a parenting assessment in Indiana if he would report to DCS for one. *Id.* at 41–42. Additionally, Covington indicated to Holland that he had recently completed a drug abuse treatment program in Illinois. *Id.* at 37. Holland then notified Covington that he would need to provide DCS with proof of his treatment in that program, but Covington never submitted any verification of his treatment. *Id.* at 38. Further, despite being informed by Holland of the procedure he must follow in order to establish paternity in this case, Covington has never followed through with his expressed intent to do so. *Id.* at 28, 40; Appellant's Br. p. 3. Following the juvenile court's termination hearing, an order was issued on March 16, 2005, terminating the parent-child relationship between Covington and S.M. This appeal now ensues.

## Discussion and Decision

Covington contends that the trial court erred in terminating his parental rights to S.M. Among the requirements that must be met before a juvenile court may terminate parental rights, Indiana Code § 31–35–2–4(b)(2) states, in pertinent part, that the court must determine that:

 (B) there is a reasonable probability that:

 (i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied;

or

 (ii) the continuation of the parent-child relationship poses a threat to the well-being of the child . . . .

This statute is written in the disjunctive and so requires a finding as to only one of the two factors listed. The DCS must prove this element by clear and convincing evidence. Ind.Code § 31–37–14–2; *In re Termination of Parent–Child Relationship of L.S.,* 717 N.E.2d 204, 208 (Ind.Ct. App.1999), *reh'g denied, trans. denied.*

We will not set aside a trial court's judgment terminating a parent-child relationship unless we determine that it is clearly erroneous. *M.H.C. v. Hill,* 750 N.E.2d 872, 875 (Ind.Ct.App.2001). Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences to support them. *Id.* In determining whether the evidence is sufficient to support the judgment terminating parental rights, this Court neither reweighs the evidence nor judges the credibility of witnesses. *Id.*

Covington contends that the juvenile court erred in determining that (1) the conditions that led to S.M.'s removal will not be remedied and that (2) continuation of the parent-child relationship poses a threat to S.M.'s well-being. Because the juvenile court's decision must be upheld if its determination as to either of these two issues was correct, we find we need only address the first issue—whether the conditions that led to S.M.'s removal are likely to be remedied. Additionally, we address a related argument the State places before us: whether a putative father who has taken no action to establish paternity has standing to challenge a juvenile court's termination of the parent-child relationship.

## I. Likelihood That Conditions Will Not Be Remedied

 To determine whether the conditions that resulted in S.M.'s removal will be remedied, the trial court must look to the parent's fitness at the time of the termination proceeding. *In re Termination of Parent–Child Relationship of D.L.,* 814 N.E.2d 1022, 1027–28 (Ind.Ct. App.2004), *trans. denied.* In addition, the court must look at the patterns of conduct in which the parent has engaged to determine if future changes are likely to occur. *Id.* at 1028. When making its determination, the trial court can reasonably consider the services offered to the parent and the parent's response to those services. *Id.*

Here, the DCS presented substantial evidence that Covington failed to fulfill the requirements set forth to him by DCS, i.e., that he establish paternity, undergo a parenting evaluation, and provide evidence of his drug abuse treatment. Covington's continued refusal to follow these recommendations demonstrates a pattern of conduct indicating that Covington is unlikely to comply with DCS or court recommendations in the future. Holland testified that he discussed these recommendations with Covington on multiple occasions and that he stressed the importance of Covington's compliance. While it is understandable that Covington did not wish to comply with specific requests regarding his parenting skills and drug and alcohol abuse without first establishing his paternity of S.M., the record is clear that he never made any attempt to follow through and establish paternity here. Covington was informed of the procedure he must follow to establish paternity and knew that this must be done in order to arrange visitation with S.M. and in order to protect his parental rights. Yet he never made any effort to follow up on this procedure.

Covington argues that he should not be held accountable for his failure to participate in services because DCS was not sufficiently diligent in attempting to arrange those services for him. Appellant's Br. p. 6–7. Under the circumstances of this particular case, however, we find his argument unpersuasive. It is true that, typically, DCS is involved in arranging for parents to obtain services to help them reunite with their children. It is also true that Covington lived out-of-state throughout these proceedings. Covington seems to suggest a duty on the part of DCS to coordinate services for out-of-state putative fathers with out-of-state service providers. However, he provides us with no authority to support this suggestion. In any case, we regard DCS's involvement with Covington to have adequately informed him of the steps he needed to take to make a showing before the juvenile court that his parental rights to S.M. should not be terminated.

DCS requested three things of Covington that would provide him with a foundation to demonstrate his fitness to parent S.M.: establish paternity, undergo a parenting assessment, and undergo a drug and alcohol assessment or provide evidence that he recently completed a drug abuse treatment program. As to a parenting assessment, DCS conducted an inquiry into the possibility of an assessment with the Illinois DCS and was informed that no such assessment was offered. DCS then offered to provide this service to Covington in Indiana. Covington, however, never made arrangements for this service, and he never indicated his desire to seek an alternative resolution of the issue. As to a drug and alcohol assessment, Covington informed DCS that he had recently completed a treatment program and was told that an assessment could be waived if he would provide documentation of this fact.

Covington failed to do so. Finally, as to paternity, Covington was informed of the procedure to establish his paternity before the court. He never made any attempt to follow up on this and has allowed the juvenile court to render a decision against him as a parent without even establishing that he *is* a parent. In other words, as to each of these three issues, the failure to pursue them in a manner that would prove to the court that Covington had the desire and ability to care for S.M. cannot be attributed to DCS. DCS provided Covington with the information he needed to take steps toward becoming a parent to this child, and he declined to make use of this information.

Covington further argues that the juvenile court erred in finding that the circumstances causing S.M.'s removal had not been remedied because, according to Covington, those circumstances involved only the mother's drug use and the fact that S.M. was born testing positive for cocaine. *Id.* at 7. We do not find the circumstances warranting removal of S.M. from *Covington's* custody to be so narrow. The most apparent impediment to Covington's parental relationship with S.M. is his questionable paternity of the child. Where Covington has failed to take any steps toward establishing his paternity or demonstrating his fitness as a parent, and where he has been aware of the steps he must take to do so for over a year, we cannot say that the juvenile court erred in determining that there is a reasonable probability that the conditions resulting in S.M.'s removal will not be remedied.

## II. Standing

■ In its brief, DCS for the first time suggests that Covington does not have standing to challenge the termination of his parental rights by the juvenile court

because he is merely a putative father and he has taken no action to establish his paternity of S.M. In support of this proposition, DCS cites Indiana Code § 31–35–1–4.5, concerning the voluntary termination of parental rights, which states:

The putative father's consent to the termination of the parent-child relationship is irrevocably implied without further court action if the father:

(1) fails to file a paternity action under IC 31–14 or in a court located in another state that is competent to obtain jurisdiction over the paternity action, not more than thirty (30) days after receiving actual notice under IC 31–19–3 of the mother's intent to proceed with an adoptive placement of the child, regardless of whether:

(A) the child is born before or after the expiration of the thirty (30) day period; or

(B) a petition for adoption or for the termination of the parent-child relationship is filed; or

(2) files a paternity action:

(A) under IC 31–14; or

(B) in a court located in another state that is competent to obtain jurisdiction over the paternity action;

during the thirty (30) day period prescribed by subdivision (1) and fails to establish paternity in the paternity proceeding within a reasonable period determined under IC 31–14–21–9 through IC 31–14–21–11 or the laws applicable to a court of another state when the court obtains jurisdiction over the paternity action.

*See also* Ind.Code § 31–19–9–15(a).[3] In asking this Court to apply this statutory

**3.** Indiana Code § 31–19–9–15(a) is an Indiana adoption statute that is substantively

language, which deals directly with the rights of a putative father to contest adoption proceedings, to the case before us, which deals with a putative father's challenge to the termination of his parental rights *before* the commencement of any adoption proceedings, DCS asks us to extend the statute beyond the boundaries set for it by our legislature. We address its argument so that we may differentiate between two options available to a child services agency taking steps toward an adoptive placement—adoption proceedings and termination proceedings—and the application of our statutory code to those options.

Indiana Code chapter 31–35–1 applies only to those proceedings where the parents of a child seek to *voluntarily* terminate their parental rights to a child. *See* Ind.Code § 31–35–1–1. Section –4.5 details the manner by which a father may be determined to have voluntarily consented to the termination of his parental rights by agreeing to an adoption. It is limited to a voluntary termination both by its own language and by the scope of chapter –1 as set forth in § 31–35–1–1. If a putative father has sufficient notice of the adoption and he does not comply with the statute, i.e., if he fails to properly object to the proceedings by following certain statutorily prescribed steps to establish his paternity, the statute presumes, logically, that he has chosen not to contest the action, and

therefore he has consented to it. *See* I.C. § 31–35–1–4.5; *see also* I.C. § 31–19–9–15(a). This amounts to a voluntary termination of his parental rights.

In contrast, Indiana Code chapter 31–35–2 applies to those proceedings where a child services agency seeks to terminate the parent-child relationship in the case of a delinquent child or a child in need of services (hereinafter, a "CHINS termination"). *See* Ind.Code § 31–35–2–1. This is an involuntary termination on the part of the parents, and the sections of this chapter largely detail the procedures a court must follow in addressing a parent's challenge to a termination action. None of the statutes in chapter –2 require that a putative father take any steps to establish his paternity in order to contest a termination action where an adoption is not pending.

■ Where a child services agency has developed a plan for adoption of a child in a particular home, that agency is free to choose between these two statutory frameworks in proceeding with the termination of a putative father's parental rights. In such a case, DCS could initiate adoption proceedings and, under section –4.5, provide the putative father with notice of those proceedings. If the father were to then move to establish his paternity under the statute, he would acquire standing to contest the adoption. In order to then go

identical to the section –4.5 voluntary termination statute. It states:

The putative father's consent to adoption of the child is irrevocably implied without further court action if the father:
(1) fails to file a paternity action:
　(A) under IC 31–14; or
　(B) in a court located in another state that is competent to obtain jurisdiction over the paternity action;
　not more than thirty (30) days after receiving actual notice under IC 31–19–3 of the mother's intent to proceed with an adoptive placement of the child, regard-

less of whether the child is born before or after the expiration of the thirty (30) day period; or
(2) files a paternity action:
　(A) under IC 31–14; or
　(B) in a court located in another state that is competent to obtain jurisdiction over the paternity action;
during the thirty (30) day period prescribed by subdivision (1) and fails to establish paternity in the paternity proceeding under IC 31–14 or the laws applicable to a court of another state when the court obtains jurisdiction over the paternity action.

forward with an adoption, DCS would need to initiate a CHINS termination under chapter –2 of the Code, seeking to terminate the father's rights over his objection. *See In re Adoption of Baby W.*, 796 N.E.2d 364, 375 (Ind.Ct.App.2003) ("The rights afforded by the involuntary termination statutes apply in adoption proceedings where the petitioners seek to adopt over the objections of one or both of the natural parents."), *reh'g denied, trans. denied.* If successful, DCS could then proceed with its petition for adoption. On the other hand, if, after receiving notice of the adoption proceedings, a putative father *failed* to take steps to establish his paternity under section –4.5, he would be presumed to consent to the adoption, and DCS could proceed unhindered by any claim he may thereafter bring. In such a case, section –4.5 provides for the implied voluntary termination of a putative father's parental rights and thereby essentially acts as a statutory mechanism to divest him of his standing to contest an adoption.

While DCS could have initiated adoption proceedings in this case and sought, under section –4.5, to divest Covington of his standing to contest the adoption, it chose instead to seek termination of Covington's rights under chapter –2 of the Code before petitioning for an adoption of S.M. by his foster parents. To do so, DCS filed a CHINS termination action in which Covington was named as the putative father of S.M. and in which he appeared to contest the termination of his parental rights. Having called Covington before the juvenile court, DCS now argues that Covington, the *respondent* in the action below, lacks standing to challenge that action. Citing section –4.5 for support, DCS argues:

> Because he took no action for over a year preceding the termination trial to establish paternity and because had the proposed adoptive parents filed their petition to adopt after the mother's parent-child relationship terminated thirty or more days prior to the trial, Covington should not have standing to contest the ending of whatever parent-child relationship he might have.

Appellee's Br. p. 9. This is an overly broad application of the reasoning behind the voluntary termination statute.

By asking this Court to apply section 31–35–1–4.5 to a termination proceeding brought under chapter 31–35–2, DCS asks us to apply a statutory tool used to divest a putative father of his standing to challenge the *voluntary* termination of his parental rights to a situation where there is no question that his rights have been *involuntarily* terminated. Such an application would certainly violate a putative father's due process rights. Further, in this particular case, DCS is asking us to divest Covington of his standing to challenge a ruling stemming from *an action wherein DCS actually named him as a respondent.* In naming Covington before the juvenile court—that is, in requesting that the juvenile court assert its jurisdiction over Covington—and by winning a judgment directly adverse to his interests, DCS has precluded itself from now arguing that Covington lacks standing. Apart from being absurd, such a result, again, would violate Covington's due process rights.

We find, then, that Covington does have standing to challenge the decision of the juvenile court terminating his parental rights to S.M. Our review of the record, however, reveals no clear error on the part of that court in determining that the conditions resulting in S.M.'s removal from Covington's care are unlikely to be remedied, and we therefore affirm its decision.

Affirmed.

ROBB, J., concurs.

MATHIAS, J., concurs with opinion.

MATHIAS, Judge, concurring.

I write only to emphasize the core holding in this case regarding Covington's standing as the putative father. That holding is that as a respondent in these involuntary termination proceedings, Covington clearly has basic constitutional standing to challenge the actions taken by the trial court. While Covington's conduct in failing to attempt to establish paternity throughout these proceedings speaks volumes as to the correctness of the trial court's termination of any parental rights he may have had, it cannot divest him of standing under the statutory termination framework enacted by our General Assembly.