**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jun 11 2012, 9:55 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**NANCY A. MCCASLIN**
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**SERGIO A. LOPEZ**
Elkhart, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: C.K. (Minor Child) and R.K. (Father),<br><br>    Appellant,<br><br>        vs.<br><br>INDIANA DEPARTMENT OF CHILD SERVICES,<br><br>    Appellee. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No.  20A04-1110-JT-534<br>)<br>)<br>)<br>)<br>)<br>) |

APPEAL FROM THE ELKHART CIRCUIT COURT
The Honorable Terry C. Shewmaker, Judge
The Honorable Deborah A. Domine, Magistrate
Cause No. 20C01-1106-JT-35

**June 11, 2012**

**DARDEN, Judge**

STATEMENT OF THE CASE

R.K. ("Father") appeals the termination of his parental rights as to his minor child,

C.K.[1]

We affirm.

ISSUES

1.  Whether the trial court violated Father's due process rights.

2.  Whether there was clear and convincing evidence to support the termination of Father's parental rights.

FACTS

C.K. was born on April 21, 2005. At some point, Father obtained legal custody of

C.K. C.K. lived with Father, his half-siblings, B.K and M.K., and his stepmother, N.K.,

who is B.K.'s mother.

Subsequently, on June 10, 2010, the Elkhart County's office for the Indiana

Department of Child Services ("DCS") received a report that Father was manufacturing

methamphetamine in a barn located on his property. Father had a prior substantiation for

methamphetamine use. Father submitted to an oral drug screen, which tested positive for

methamphetamine. A hair drug screen performed on C.K. also tested positive for

---

[1] The trial court also terminated the parental rights of C.K.'s mother. ("Mother"). She does not appeal the termination.

methamphetamine. Pursuant to an emergency custody order, DCS placed C.K. with his paternal grandparents, T.S. and J.K. DCS placed B.K. and M.K. with their mothers, N.K. and S.F., respectively.

On July 12, 2010, DCS filed a petition, alleging C.K. to be a child in need of services ("CHINS"). That same day, the trial court appointed a court-appointed special advocate ("CASA"). Following a hearing on July 20, 2010, Father admitted that C.K. had tested positive for methamphetamine but denied manufacturing methamphetamine. The trial court found C.K. to be a CHINS.

On August 17, 2010, the trial court entered its dispositional order, wherein it continued C.K.'s placement with his grandparents. The trial court ordered Father to submit to random drug and alcohol screens; participate in a substance abuse assessment and follow all recommendations; "participate in a treatment program or pay for services, consistent with the recommendation of DCS"; and participate in weekly supervised visits with C.K., "with a move to unsupervised visits at the discretion[] of DCS and [C.K.'s] CASA." (App. 58). The trial court further ordered Father to pay $54.76 per week to T.S. in child support. The trial court also ordered visitation between C.K. and his siblings.

On or about September 10, 2010, T.S. died in a methamphetamine-related explosion. C.K. witnessed his grandmother's injuries. Without notifying DCS, Father took C.K. back into his care and control.

On September 15, 2010, DCS filed an emergency motion to modify the dispositional decree, seeking to place C.K. in foster care and requesting unsupervised

3

visitation between C.K. and his stepmother, N.K., who had moved to Michigan. In support thereof, DCS asserted that C.K. had been raised by N.K.; C.K. had an "established caregiver relationship" with N.K.; and that N.K. would facilitate visitation between C.K. and B.K. (App. 60). The trial court granted the modification and ordered that C.K. be placed in foster care, "with a move to less restrictive placement a[t] the discretion of DCS," and that unsupervised visitation "begin immediately between [C.K.] and [N.K.]" (App. 62).

Following a modification hearing on September 20, 2010, the trial court suspended visitation between C.K. and Father. The trial court also ordered C.K. to "remain in an extended visit in the home of [N.K.] pending the completed interstate compact" and that Father have no contact with either C.K. or N.K. (App. 73). Finally, the trial court noted that "a Personal Protection Order issued by the State of Michigan was served on [Father] in open Court." (App. 74).

On November 8, 2010, DCS filed a motion for rule to show cause, asserting that Father had violated the no-contact order. Specifically, DCS asserted that Father had telephoned N.K. on three separate occasions and had stated "that he ha[d] a plan up his sleeve to get [C.K.] back and that [N.K.] will never see him again." (App. 75). The trial court held a hearing on the motion for rule to show cause on November 10, 2010. After finding that "the hearing was set too quickly to insure that [F]ather received notice" of the hearing, the trial court continued the hearing to January 13, 2011. (App. 76).

At some point prior to January 10, 2011, Father relocated to Florida for a job opportunity. Father therefore ceased participating in services. Thereafter, the trial court held a hearing on DCS's motion for rule to show cause. The trial court found that Father had failed to complete the court-ordered intensive outpatient drug treatment program, missing seventeen sessions; violated the no-contact order on four separate occasions; and had failed to pay child support. The trial court therefore ordered that Father serve forty-eight hours in jail.

On June 15, 2011, DCS filed a petition to terminate the parents' parental rights. The trial court set an initial hearing for July 14, 2011. Father, by counsel, filed a motion to appear telephonically. The trial court granted Father's motion.

On July 14, 2011, the trial court held the initial hearing on DCS's petition to terminate. Although "attempts were made to contact [F]ather to appear by telephone," he failed to appear. (App. 107). Counsel, however, appeared and represented Father. The trial court therefore ordered Father to appear in person at the evidentiary hearing set for September 9, 2011. On August 30, 2011, Father filed a motion to appear at the evidentiary hearing telephonically, asserting that he was unable to travel from Florida. Finding that "Father had notice of his obligation to appear and has had nearly two months to make travel arrangements," the trial court denied Father's request. (App. 113).

The trial court held the final hearing on September 9, 2011. Father, by counsel, again moved to appear telephonically. The trial court denied the motion.

5

Alicia Kimble, the family's case manager, testified that even prior to the entry of the no-contact order between Father and N.K., Father failed to exercise visitation with C.K. According to Kimble, Father "didn't seem interested" and "never tried to have visitations with [C.K.]" (Tr. 242). Kimble also testified that Father failed to complete a substance abuse program; failed to comply with the court-ordered drug screens; and failed to stay in contact with Kimble. According to Kimble, Father passed two drug screens, both of which were administered during Father's visits to Indiana from Florida; the screens, however, were not random. She also testified that Father completed an on-line substance abuse class in Florida. Kimble, however, did not believe the class met DCS's standards because it was "[o]nly a 24-hour online substance abuse course . . . ." (Tr. 243). She testified that it "couldn't give you [as] much information as hands-on in class, one-on-one or group sessions . . . ." (Tr. 243).

Kimble opined that termination of Father's parental rights would be in C.K.'s best interests "so that [C.K.] can have a stable drug-free living environment where his needs are being met, that he feels love, he feels secure and safe." (Tr. 253). Finally, Kimble testified that DCS's plan for C.K. is adoption and that N.K. had expressed a desire to adopt him.

The CASA testified that she did not believe Father could provide a stable environment for C.K. due to Father's "lack of compliance with services and . . . just overall his lack of involvement in [C.K.]'s life." (Tr. 259). She further testified that she

6

believed termination of Father's parental rights to be in C.K.'s best interests because N.K provides a "stable parental figure" and "healthy environment." (Tr. 261).

In lieu of testimony, the trial court admitted a letter from Father into evidence. In the letter, Father asserted that he had passed "several random drug screenings"; "completed drug classes"; completed parenting classes; and complied with the no-contact order. (Father's Ex. 1).

On September 19, 2011, the trial court entered its order, terminating Father's parental rights.

DECISION

1. Due Process

Father asserts that the trial court violated his due process rights by denying his motions to appear at the final hearing telephonically and proceeding in Father's absence.

Although parental rights are of a constitutional dimension, the law allows for termination of these rights when parties are unable or unwilling to meet their responsibility. *In re A.N.J.*, 690 N.E.2d 716, 720 (Ind. Ct. App. 1997). The purpose of termination of parental rights is not to punish parents but to protect children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

> [T]he Due Process Clause of the United States Constitution prohibits state action that deprives a person of life, liberty, or property without a fair proceeding. When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."

7

The nature of process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure. The balancing of these factors recognizes that although due process is not dependent on the underlying facts of the particular case, it is nevertheless "flexible and calls for such procedural protections as the particular situation demands."

*D.A. v. Monroe County Dep't of Child Serv.*, 869 N.E.2d 501, 510 (Ind. Ct. App. 2007) (internal citations omitted). A parent in a proceeding to terminate the parent-child relationship is statutorily entitled to (1) cross-examine witnesses, (2) obtain witnesses or tangible evidence by compulsory process, and (3) introduce evidence on behalf of the parent. *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011) (citing Indiana Code section 31-32-2-3(b)).

Both the private interests and the countervailing governmental interests that are affected by the proceeding are substantial. *Id*. "In particular, the action concerns a parent's interest in the care, custody, and control of his children, which has been recognized as one of the most valued relationships in our culture." *Id.* The right to raise one's children is an essential and basic right. *Id.* Thus, "a parent's interest in the accuracy and justice of the decision is commanding." *Id.* "On the other hand, the State's parens patriae interest in protecting the welfare of the children involved is also significant." *Id.*

When balancing the competing interests of a parent and the State, we must consider the risk of error created by the challenged procedure. In prior opinions, this court has addressed whether proceeding with a termination hearing in a parent's absence

8

violates the parent's constitutional right to due process. Generally, we have held that there is no constitutional right for a parent to be <u>physically present</u> at a termination hearing. *See In re B.J.*, 879 N.E.2d 7, 16 (Ind. Ct. App. 2008), *trans. denied*. In so holding, this court has determined that the rights of the parent are sufficiently protected where the parent is represented by counsel throughout the termination hearing; the parent's counsel is provided with an opportunity to cross-examine witnesses; and the parent, through counsel, is able to introduce evidence. *See id*. at 17. In this case, Father challenges the trial court's denial of his motion to appear <u>telephonically</u> rather than in person.

The record shows that the trial court ordered Father to appear in person at the evidentiary hearing after he failed to appear telephonically at an initial hearing on DCS's petition to terminate his parental rights. In so doing, the trial court set the hearing two months in advance, giving Father time to arrange transportation and time off from work. Only ten days prior to the hearing, Father filed a motion to appear telephonically. The trial court denied the motion and held the final hearing as scheduled. Father did not appear at the final hearing; counsel, however, represented Father during the entire hearing and cross-examined witnesses. Furthermore, the trial court admitted and considered a letter from Father into evidence in lieu of his testimony.

Given these facts, we cannot say that the trial court's refusal to allow Father to participate telephonically resulted in a significant risk of error. Furthermore, we cannot agree with Father that the procedure prejudiced him by precluding him "from presenting

9

evidence of what he had accomplished during the pendency of the case" and "prohibit[ing] [Father] from presenting evidence in defense of the allegations . . . ." Father's Br. at 22. The trial court admitted into evidence Father's letter, which detailed the actions he had taken during the course of the CHINS-proceeding, and there is no evidence in the record that Father attempted to present any additional evidence. We therefore do not find that the trial court's denial of Father's motion to appear telephonically violated Father's due process rights.

2. Order

Father asserts that the trial court erred in terminating his parental rights. Specifically, Father asserts that the trial court's findings are deficient because the findings merely recite the testimony of witnesses. Father also asserts that the trial court's findings of fact and conclusion of law are not supported by the evidence.

In reviewing the termination of parental rights, we will neither reweigh the evidence nor judge the credibility of witnesses. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence most favorable to the judgment. *Id.* Where the trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Id.* We must determine whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the conclusions or the conclusions do not support the judgment. *Id.*

Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences to support them. *In re Adoption of T.J.F.*, 798 N.E.2d 867, 874 (Ind. Ct. App. 2003). Erroneous findings include findings that are merely a recitation of the evidence. *Id.*

> A court or an administrative agency does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z. Rather, the trier of fact must find that what the witness testified to is the fact. Additionally, the trier of fact must adopt the testimony of the witness before the "finding" may be considered a finding of fact.

*Id*. (internal citation omitted).

Provided, however, "there exist at least some valid findings to support the trial court's conclusions, erroneous findings will not prove fatal." *A.F. v. Marion County Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. "Because findings of fact are not to be reviewed individually, we review them in their entirety to determine if they support the court's legal conclusions or if they constitute an abuse of discretion." *Id*.

When DCS seeks to terminate parental rights, it must plead and prove in relevant part that:

(B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

. . . .

> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). These allegations must be established by clear and convincing evidence. *I.A.*, 934 N.E.2d at 1133.

Because subsection (b)(2)(B) is written in the disjunctive, DCS need prove only one of the two elements by clear and convincing evidence. *See Bester v. Lake County Office of Family and Children*, 839 N.E.2d 143, 153 n.5 (Ind. 2005). Thus, if we hold that the evidence sufficiently shows that the conditions resulting in removal will not be remedied, we need not address whether the continuation of the parent-child relationship poses a threat to the well-being of D.T. *See* I.C. § 31-35-2-4(b)(2)(B); *A.N.J.*, 690 N.E.2d at 721 n.2.

a. *Conditions remedied*

In this case, Father asserts that DCS failed to establish that the conditions resulting in the removal of C.K. will not be remedied. To determine whether the conditions are likely to be remedied, the trial court must examine the parent's fitness to care for the child "as of the time of the termination hearing and take into account any evidence of changed conditions." *In re S.P.H.*, 806 N.E.2d 874, 881 (Ind. Ct. App. 2004). The trial court, however, also must determine whether there is a substantial probability of future neglect or deprivation. *Id.* In so doing, the trial court "may properly consider evidence

12

of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *McBride v. Monroe County Office of Family and Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

The trial court may also consider the services offered to the parent and the parent's response to those services. *Id.* "Finally, we must be ever mindful that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination." *Id.* Thus, the trial court need not wait until a child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

Here, the trial court found that Father was held in contempt for "failing to attend court ordered Intensive Outpatient drug treatment, for failing to pay child support, and for contacting and making threats against [N.K.] in violation of court orders." (App. 9). The trial court further found that Father "has exhibited a pattern of unwillingness to work with the DCS and service providers. [F]ather, made the choice to move away from his child even though the case manager warned it would make reunification more difficult. [F]ather has shown little commitment to his child." (App. 14). The trial court also reiterated its previous findings that Father had failed to comply with the case plan by not completing a substance abuse assessment; not maintaining contact with DCS; missing seventeen sessions of his drug treatment program; paying no child support; and violating the no-contact order.

13

The evidence shows that DCS removed C.K. from Father's care due to Father's alleged manufacturing and use of methamphetamine. Father denied manufacturing methamphetamine; however, both Father and C.K. tested positive for methamphetamine. Accordingly, the trial court ordered Father to submit to random drug screens. Father, however, only submitted to two drug tests, neither of which was random, during the fifteen months from the date DCS removed C.K. until the final hearing.

Furthermore, the evidence shows that Father failed to comply with court-ordered services, including following the recommendations for substance-abuse treatment; failed to fully participate in visitation; failed to pay child support, despite his purported employment in Florida; and did not maintain contact with DCS.[2] Father also violated the trial court's no-contact order.

We find that the evidence clearly and convincingly supports the findings, which clearly and convincingly support trial court's conclusion that the conditions that resulted in C.K.'s removal will not be remedied. We therefore cannot say the trial court's judgment is clearly erroneous.

b. *Best interests*

Father also challenges the trial court's finding and determination that termination of his parental rights is in the best interests of C.K. For the "best interest of the child" statutory element, the trial court is required to consider the totality of the evidence and

---

[2] We note that Father seems to argue that DCS should have offered or arranged for services in Florida. We cannot say, however, that DCS has a duty to provide or coordinate out-of-state services. *See, e.g., In re S.M.*, 840 N.E.2d 865, 869 (Ind. Ct. App. 2006). Furthermore, Father does not dispute that DCS offered services in Indiana.

14

determine whether the custody by the parent is wholly inadequate for the child's future physical, mental, and social growth. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010). In making this determination, the trial court must subordinate the interest of the parent to that of the child involved. *Id.* In addition, the recommendations of the caseworker and CASA that parental rights be terminated support a finding that termination is in the child's best interests. *C.T. v. Marion County Dep't of Child Serv.*, 896 N.E.2d 571, 586 (Ind. Ct. App. 2008), *trans. denied*.

As to whether termination of Father's parental rights would be in C.K.'s best interests, the trial court found, inter alia, that C.K. "has in essence lost his father because his father made the choice to move to Florida and has not participated in services or visited his child ever since." (App. 16). The trial court further found that Father "has demonstrated a lack of stability in his commitment to his child since the start of this case as evidenced by his lack of contact with the child. The commitment is necessary for the child to ever feel safe and secure. The court finds the father cannot meet the child's needs." (App. 16).

Both DCS case manager Kimble and the CASA testified that it would be in C.K.'s best interests to terminate Father's parental rights as C.K. needs stability and permanency. The trial court heard testimony that Father's pattern of behavior indicates that he lacks the motivation to provide a stable environment for C.K. This is reflected in Father not participating in services or visitation with C.K. and moving to another state in

15

the midst of the CHINS case. The recommendations and testimony support the trial court's finding that termination of Father's parental rights is in C.K.'s best interests.

### c. *Satisfactory plan*

Father maintains that DCS "failed to provide testimony that clearly and convincingly showed that at the time of the evidentiary hearing, . . . adoption was a satisfactory plan for placement of C.K." Father's Br. at 34. We disagree.

Before the trial court may terminate the parent-child relationship, it must find that there is a satisfactory plan for the care and treatment of the child. *In re S.L.H.S.*, 885 N.E.2d 603, 618 (Ind. Ct. App. 2008). "This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *Id.* Generally, adoption is a satisfactory plan. *See id.*

DCS presented evidence that C.K. has a bond with, and is doing well in the care of, N.K., his stepmother. Kimble testified that DCS's permanency plan for C.K. is adoption, and N.K. testified that she is interested in adopting C.K. Given the evidence, DCS has proved that there is a satisfactory plan in place.[3]

---

[3] Father argues that the "[b]ecause the order does not indicate the court considers [DCS]'s plan satisfactory, the plan should be considered as not satisfactory." Father's Br. at 33. In finding that termination of Mother's parental rights would be in C.K.'s best interest, the trial court found that DCS "has a satisfactory plan for the care and treatment" of C.K., which is adoption. (App. 8). As we review the trial court's findings in their entirety, we cannot say that the trial court erred in terminating Father's parental rights. *See A.F.*, 762 N.E.2d at 1251.

Upon review, we find that DCS established its allegations against Father by clear and convincing evidence. Such evidence supports the trial court's findings that the conditions that resulted in the removal of C.K. will not be remedied; that termination is in his best interests; and that DCS has a satisfactory plan. Furthermore, the trial court's findings sufficiently support the trial court's conclusions. Accordingly, the elements necessary to sustain the termination of Father's parental relationship with C.K. were established by clear and convincing evidence.

Affirmed.

NAJAM, J., and RILEY, J., concur.