MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 29 2016, 6:17 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Rachel E. Doty
David K. Payne
Braje, Nelson & Janes, LLP
Michigan City, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of T.S., Father, and N.B., Child,

T.S.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

January 29, 2016

Court of Appeals Case No.
46A05-1506-JT-629

Appeal from the
LaPorte Circuit Court

The Honorable
Thomas A. Alevizos, Judge
The Honorable
W. Jonathan Forker, Magistrate

Trial Court Cause No.
46C01-1502-JT-59

**Kirsch, Judge.**

[1] T.S., the alleged father of Nio.B. ("Child"), appeals the juvenile court's order terminating his parental rights to Child. He raises two issues on appeal that we restate as:

> I. Whether the juvenile court committed fundamental error by terminating T.S.'s parental rights to Child even though T.S.'s paternity had not been established.

> II. Whether sufficient evidence was presented to support the termination of T.S.'s parental rights.

[2] We affirm.

## Facts and Procedural History

[3] Child was born to R.B. ("Mother") in LaPorte County on September 24, 2012. At the time, T.S. was Mother's boyfriend and is the alleged biological father of Child. In August 2013, Child and her two half-brothers, Ni.B. and N.B., were living in a home with T.S., Mother, and T.S.'s mother ("Grandmother"). On or about August 13, 2013, Sergeant Kenneth Havlin of the Michigan City Police Department was called to the emergency room at St. Anthony's Hospital ("the Hospital") in Michigan City, Indiana. Ni.B. was in the emergency room for treatment of injuries that included a severely lacerated liver, a ruptured spleen, a ruptured appendix, and bruising, which were believed to be caused by blunt force trauma. Ni.B. died from the injuries.

[4] Sergeant Havlin contacted the LaPorte County Department of Child Services ("DCS") on August 15, 2013, to advise of Ni.B.'s death and that T.S. was being

investigated as the alleged perpetrator. That same day, DCS Family Case Manager Barbara Swistek ("FCM Swistek") went to the home to assess the situation and possibly take the surviving two children, Child and N.B., to the hospital for a forensic interview and "just a kind of a check" on them. *Tr.* at 13. The family "was not being cooperative," so DCS obtained a detention order of the children and took them to the Hospital. *Id.* at 14. Child was examined at the Hospital and had what appeared to be three cigarette burns to her neck, and N.B. was in "much worse condition" and presented with various physical injuries, including a broken rib, burns on his body including his genital area, as well as bruises, scars, and a black eye. *Id.* at 15. The two also were suffering from malnutrition and dehydration.

[5]     On August 16, 2013, DCS filed a child in need of services ("CHINS") petition, alleging, as is relevant here, that Child's physical or mental health was seriously endangered and that she needed care and treatment that was unlikely to be provided without court intervention. The CHINS petition also alleged that T.S. had previously been convicted of battery in May 2013, stemming from battering Mother when she was pregnant. On the same day that DCS filed its petition, the juvenile court removed Child and N.B. from the care of Mother and T.S. and placed the two children in foster care.

[6]     On September 30, 2013, T.S. was arrested and detained at the LaPorte County Jail on charges of murdering Ni.B. and felony neglect of a dependent, relative to the injuries to Child and N.B. Near the same time, Mother was also arrested and charged in connection with the children's injuries. Both Mother and T.S.

have remained incarcerated throughout the course of the CHINS and termination of parental rights proceedings. According to the State, T.S.'s trial is anticipated to occur in June 2016.

[7] On October 2, 2013, the juvenile court held a fact-finding hearing on the CHINS petition and thereafter issued findings and adjudicated Child a CHINS. Its findings included that Child had injuries "indicative of physical abuse and malnutrition according to a medical evaluation," that "[t]here is no record that [Mother or T.S.] sought medical treatment for [Child]," and Child's "physical or mental health is seriously endangered due to injury by the act or omission of the child's parents." *Appellant's App.* at 42-43. During the CHINS proceedings, Child was initially placed in short-term foster care, but was later placed with relatives in Kentucky. On October 30, 2013, the juvenile court held a dispositional hearing and ordered reunification services. T.S. was ordered to: refrain from having contact with Child; keep DCS informed of his criminal status; execute any necessary releases of information; and inform DCS and the court appointed special advocate ("CASA") of his address, phone number, and employment.

[8] On February 18, 2015, the juvenile court changed the permanency plan from reunification to termination of parental rights and adoption, and on or around February 25, 2015, DCS filed a petition for termination of T.S.'s parental

rights.[1]  On April 27, 2015, the juvenile court held a fact-finding hearing on the termination petition.  At the hearing, the following testimony was presented. Sergeant Havlin testified that he first met T.S. in August 2013, when he was called to the Hospital, and he was involved in the ensuing investigation of Ni.B.'s death.  It was determined that Ni.B. died of blunt force trauma, and T.S. was charged with murder; T.S. also faced neglect of a dependent charges for injuries to Child and N.B.  Sergeant Havlin testified that T.S. admitted to being present at the time that the children were abused.  He also testified that T.S. had a juvenile and adult criminal history, and the adult criminal history included battery on Mother when she was pregnant.

[9]  FCM Swistek testified that, although paternity was never established, both Mother and T.S. believed that T.S. is Child's father.  CASA Fred Connor ("CASA Connor") similarly testified that, although paternity was not established, "it has never been denied."  *Tr.* at 47.  FCM Swistek explained that paternity was not established during this case because T.S. was incarcerated in a high security area of the LaPorte County Jail, and the authorities were not willing to transport him for testing.  For that same reason, services such as therapy were not available to T.S. because "as long as he was in a high security area, we are not allowed to send [in a] therapist and the jail will not allow us to have people come and visit him."  *Id.* at 39.  FCM Swistek testified that she sent progress reports to T.S. in jail, as well as court orders, but T.S. never contacted

---

[1] On February 10, 2015, Mother executed a waiver of notice and consent to adoption of Child.

her while he was incarcerated to ask about Child, and he only inquired about services once, after the termination petition was filed. *Id.*

[10] FCM Swistek testified that she was at the Hospital when Child and her half-siblings were brought there. Child had three burns to her neck, which the doctor concluded were cigarette burns. N.B. was "a lot worse," with a broken rib, numerous bruises, burn marks and scars on his body, bruises to his genital area, and a black eye. *Id.* at 15. Both Child and N.B. were malnourished and dehydrated.

[11] Child and N.B. were placed with foster mother C.G. from August 2013 to October 2014. C.G. testified at the termination hearing, describing that, at first, Child clung to her, and Child would hit or bite anyone that came close to her, especially a male. *Id.* at 42. Child also suffered from night terrors. At the time of removal, she was eleven months old and her only words were "stop it." *Id.* After about a month in the foster home, Child's night terrors quit, and a couple months later, her hitting and biting decreased. When Child left C.G.'s care, Child was a "very loving" and "[v]ery awesome, beautiful child." *Id.* at 43. In October 2014, Child and N.B. were placed with a relative in Kentucky. As of the termination hearing, Child no longer experienced night terrors and was "doing well." *Id.* at 32. CASA Connor observed that Child and N.B. were bonded and "very close[.]" *Id.* at 47.

[12] Prior to incarceration, T.S. was convicted of battering Mother. As part of that criminal proceeding, T.S. was ordered to, but did not, complete anger

management programming, which FCM Swistek considered important because information gained throughout the case informed her that T.S. "does have issues with anger management," and the court-ordered counseling "would have benefited him." *Id*. at 28. FCM Swistek expressed concern about T.S.'s battery conviction because when he committed the offense, "[M]other was pregnant and there was no regard for the life she was carrying." *Id*. at 38. FCM Swistek testified that, even if T.S. were to be released from incarceration soon, she would not place Child in his care because of "his violent history[,] his past[,] and the allegations that are against him." *Id*. at 29.

[13] FCM Swistek testified that it was her opinion that there was a reasonable probability that the conditions that led to Child's removal would not be remedied and that continuation of the parent-child relationship posed a threat to Child's well-being because "[T.S.] has an unpredictable violent history" and he has not completed, at any time, services to address that. *Id*. at 30. She also testified that it was in Child's best interests for T.S.'s parental rights to be terminated. CASA Connor agreed and testified that termination of the parent-child relationship "absolutely" was in Child's best interests, noting that Child's current home provided "a safe, loving family environment" and family support. *Id*. at 49. FCM Swistek testified that Child and N.B. were in a stable and loving home and had established roots there and that DCS's plan for Child was adoption. *Id*.

[14] On May 12, 2015, the juvenile court issued its findings of fact, conclusions, and order terminating T.S.'s parental rights to Child. He now appeals.

# Discussion and Decision

## *I. Jurisdiction*

[15] T.S. asserts that, because his paternity was never established, the juvenile court "lacked jurisdiction over [him.]" *Appellant's Br.* at 4. Initially, we observe that a defendant can waive the lack of personal jurisdiction and submit himself to the jurisdiction of the court if he or she responds or appears and does not contest the lack of jurisdiction. *Thomison v. IK Indy, Inc.*, 858 N.E.2d 1052, 1055 (Ind. Ct. App. 2006). Here, there is no indication that T.S. contested the juvenile court's personal jurisdiction over him during the CHINS or termination proceedings. Rather, the record reflects that counsel entered an appearance on T.S.'s behalf and represented him in both the CHINS and the termination proceedings, T.S. appeared in person or by video conference at most or all of the CHINS and termination hearings, and T.S. agreed to the juvenile court's dispositional order. *See Appellant's App.* at 38 (stating that Mother and T.S. "agree to the dispositional orders"). T.S. appeared in person and by counsel at the termination hearing. Accordingly, T.S. submitted to the jurisdiction of the juvenile court, and the issue is waived for appellate consideration. Waiver notwithstanding, we conclude T.S.'s claim fails on its merits.

[16] T.S.'s argument is not that the termination statutes preclude termination of an alleged parent's rights. Rather, T.S.'s position is that the juvenile court did not have jurisdiction to enter a CHINS dispositional order – "compelling [his] cooperation and participation" with DCS – and "because the [juvenile] court lacked jurisdiction to issue the Dispositional/Parental Participation Order," the

subsequent termination order was premised on a "defective" dispositional order. *Appellant's Br.* at 4, 7. T.S. acknowledges that he "did not raise any objection based on the court's lacking jurisdiction over T.S." either at the entry of the dispositional order[2] or after the termination petition was filed, but argues that the juvenile court, by issuing a "defective" dispositional order, and later terminating T.S.'s rights, failed to comply with the statutory conditions precedent to the termination of parental rights and thus committed fundamental error. *Id.*; *see In re D.D.*, 962 N.E.2d 70, 75 (Ind. Ct. App. 2011) (trial court's failure to ensure that State has fully complied with statutory mandates of termination statutes is fundamental error). Here, we find no error, fundamental or otherwise.

[17] In support of his position that the juvenile court lacked jurisdiction over him and could not issue a dispositional decree, T.S. cites to Indiana Code section 31-9-2-88 ("Section 88"), which is within the "Definitions" article of the Family and Juvenile Law title of the Indiana Code. T.S. states that Section 88 defines a "parent" as a "biological or adoptive parent," thus excluding him because he is an alleged parent. He also refers us to *In re M.R. v. Ind. Dep't of Child Servs.*, 934 N.E.2d 1253, 1255 (Ind. Ct. App. 2010), where this court, relying on Section 88, held that a juvenile court in a CHINS proceeding did not have authority to

---

[2] "The time for appealing an issue in a CHINS proceeding commences when the dispositional decree is entered." *Smith v. Marion Cnty Dep't Pub. Welfare*, 635 N.E.2d 1144, 1148 (Ind. Ct. App. 1994), *trans. denied*.

enter a parental participation decree against an alleged father whose paternity had not been established.

[18] As the State points out, our Legislature amended Section 88, effective July 2011, which we note was after *In re M.R.* was decided, and the definition of "parent" for purposes of Indiana Code chapters 31-35-2, 31-34-16, and 31-34-20,[3] among others, now includes "an alleged father." *See* Ind. Code § 31-9-2-88(b). Thus, the juvenile court in this case had the authority to enter a dispositional order requiring T.S., an alleged father, to engage in and complete services; therefore, the dispositional order was not defective, and T.S.'s argument – that the termination relied on a defective dispositional order – fails.

[19] Furthermore, the trial court's subsequent termination order did not rely entirely on the dispositional order. That is, even if it was defective, the disputed dispositional order was not the sole basis upon which the juvenile court relied when it terminated T.S.'s parental rights. T.S. acknowledges as much, stating, "[T]he trial court concluded that the termination . . . was proper, *in part*, because [Child] had been removed under [the] dispositional order for at least six (6) months under a dispositional decree[.]" *Appellant's Br.* at 7 (emphasis added). In any event, and contrary to T.S.'s claim that "[a] juvenile court cannot terminate a man's parental rights if his parental rights were never

---

[3] Indiana Code chapter 31-35-2 concerns termination of parental rights to a delinquent child or a child in need of services, and Indiana Code chapters 31-34-16 and 31-24-20 concern, respectively, a petition for parental participation in a CHINS proceeding and a CHINS dispositional decree in which a juvenile court can order a child's parent to participate in services.

established," *Appellant's Br.* at 5, a number of Indiana cases have recognized that it is not mandatory to establish paternity before terminating parental rights. *See In re S.M.*, 840 N.E.2d 865, 870 (Ind. Ct. App. 2006) (evidence, including putative father's failure to establish paternity or demonstrate fitness as parent, supported termination of putative father's parental rights); *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003) (evidence sufficient to terminate putative father's parental rights), *trans. denied*; *Young v. Elkhart Office of Family & Children*, 704 N.E.2d 1065, 1068 (Ind. Ct. App. 1999) (judgment terminating putative father's parental rights was not clearly erroneous); *In re K.H.*, 688 N.E.2d 1303, 1305 (Ind. Ct. App. 1997) (paternity did not have to be established before terminating parental rights); *In re A.C.B.*, 598 N.E.2d 570, 572 (Ind. Ct. App. 1992) (recognizing that statutes governing termination of parental rights do not require adjudication of paternity prior to termination). Accordingly, T.S. has failed to establish that the juvenile court did not have jurisdiction over him, did not have authority to issue the dispositional order, and could not thereafter terminate his parental rights to Child.

## II. *Sufficiency of Evidence*

As our Supreme Court has recently reiterated, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145,

149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. at 148-49.

[21] Here, in terminating T.S.'s parental rights to Child, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id*. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[22] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *Id*. at 1155. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re H.L.*, 915 N.E.2d at 149. In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may

be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013).

[23] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B)  that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)  that termination is in the best interests of the child; and
>
> (D)  that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).  The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d at 149.  Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a) (emphasis added).

[24] T.S. argues that DCS failed to prove the required elements for termination by sufficient evidence. Specifically, he contends that DCS failed to present sufficient evidence that the conditions that resulted in Child being removed or the reasons for her placement outside the home would not be remedied. T.S. also argues that DCS failed to present sufficient evidence that the continuation of the parent-child relationship posed a threat to Child's well-being.[4]

### *Remediation of Conditions*

[25] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.,* 989 N.E.2d at 1231). Pursuant to this rule,

---

[4] T.S. does not assert that DCS failed to prove that termination was not in Child's best interest or that there was not a satisfactory permanency plan in place for Child. Accordingly, he has waived any challenge to those elements of the termination statute. Ind. Appellate Rule 46(A)(8)(a).

"trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *A.F. v. Marion Cnty. Office of Family & Children,* 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied.* In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d at 643. Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id*.

[26] Here, Child was removed from the home on August 15, 2013, after DCS received the autopsy report and learned that Child's two-year-old half-brother, Ni.B., had died of blunt force trauma and that T.S. was the suspected perpetrator. The medical examination at the Hospital revealed that Child had cigarette burns to her neck and her half-sibling, N.B., also displayed signs of abuse, including, scars and burn marks appearing "throughout his entire body," a severely bruised genital area, and a black eye. *Tr.* at 15. The two of them were also malnourished and dehydrated. There is no evidence that T.S. or Mother had sought or obtained medical treatment for Child or her half-siblings. In fact, T.S. and Mother were uncooperative with DCS, such that DCS was

required to obtain a detention order to bring Child and N.B. to the Hospital for a check on their wellness. A couple of months later, T.S. was arrested on charges of murder for the death of Ni.B. and neglect of a dependent stemming from the abuse and neglect of Child and N.B. Child was never returned to Mother's or T.S.'s care because they were incarcerated throughout the CHINS and termination proceedings. Child's continued placement outside of T.S.'s care was due to his continuing incarceration, which rendered T.S. incapable of providing Child with food, clothing, shelter, and other basic life necessities. At the time of the April 2015 termination hearing, these conditions had not been remedied. T.S. was expected to go to trial on his pending charges in June 2016. As we previously stated in another case involving an incarcerated parent, "[e]ven assuming that [father] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006) (concluding that trial court did not commit clear error in finding conditions leading to child's removal from father would not be remedied where father, who had been incarcerated throughout CHINS and termination proceedings, was not expected to be released until after termination hearing), *trans. denied.*

[27] T.S. also had a criminal history, which included violence on Child's then-pregnant Mother. As part of that criminal proceeding, T.S. was ordered to complete anger management programming, but never did so. FCM Swistek testified that she was concerned about T.S.'s violent tendencies, beginning in

his youth, and his failure to address those issues. T.S. was housed in a high-security segregated part of the jail and, therefore, was not able to receive services or establish paternity. However, the testimony presented was that T.S. held himself out as being Child's father, and there was no evidence he denied paternity at any time. Indeed, he agreed to the juvenile court's CHINS dispositional order. Despite being aware of the CHINS and termination proceedings, T.S. did not contact FCM Swistek to inquire about Child's whereabouts, health, or status, except one time after the termination proceedings had been filed. FCM Swistek testified that in her opinion there was not a reasonable probability that the problems that led to removal would be remedied. CASA Connor stated likewise. Based on the evidence presented, we cannot say that the juvenile court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in Child's placement outside the home will not be remedied.

### Threat to Well-Being

[28] T.S. also contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of Child. However, we need not address such argument. Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1156. Therefore, as we have already determined that sufficient evidence supported the

conclusion that the conditions that resulted in the removal of Child would not be remedied, it is not necessary for us to address any argument as to whether sufficient evidence supported the conclusion that the continuation of the parent-child relationship posed a threat to the well-being of Child.

[29] That said, DCS presented evidence that T.S. exhibited violent behaviors when he was a child. Later, he was convicted as an adult of battering Mother when she was pregnant. He failed to seek or obtain any anger management services, although he was court-ordered to do so. Thereafter, three children living with T.S., were each found to have injuries consistent with physical abuse, and one of those children died as a result of that abuse. T.S. is facing murder charges stemming from that death, as well as other charges related to Child's injuries. Child's first foster mother, C.G., testified that when Child was initially placed with her, Child would bite and hit any individual that came near her, particularly a male, and Child's only words were "stop it." *Tr.* at 42. However, after some time at the foster home, Child quit hitting and biting people, and she became a loving child. We have recognized, "[A] trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *In re A.F.*, 762 N.E.2d at 1253. Here, T.S. has not demonstrated that the juvenile court's conclusion that continuation of the parent-child relationship poses a threat to Child's well-being is clearly erroneous.

[30] We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the juvenile court's termination of T.S.'s parental rights to Child was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[31] Affirmed.

Mathias, J., and Brown, J., concur.